UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| [1] JAMES D. COPHER<br>[2] CYNTHIA COPHER<br>[3] JAMES RICHARD<br>[4] ROSAMMA RICHARD, on Behalf of<br>Themselves and all others Similarly Situated,<br><br>                Plaintiffs,<br>   vs.<br><br>[1] BANK OF AMERICA, N.A.<br>[2] BAC HOME LOANS SERVICING, L.P.,<br><br>                Defendants. | Case No.: CIV-13-353-M<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs James D. Copher, Cynthia Copher (together with James D. Copher, the "Cophers"), James Richard, and Rosamma Richard (together with James Richard, the "Richards") (collectively, "Plaintiffs"), by their attorneys, on behalf of themselves and the Class set forth below, allege the following upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on Plaintiffs' respective personal knowledge:

## NATURE OF THE ACTION

1. Plaintiffs have residential mortgages on their homes that are held by BAC Home Loans Servicing, LP ("BAC") or its successor, Bank of America, N.A. ("BANA," collectively with BAC, "Defendants").

2. These mortgages require Plaintiffs to have property insurance to protect the Plaintiffs' and Defendants' interests in the properties. The mortgages also require that

any policy include a standard mortgage clause, whereby any insurance reimbursements for losses are paid to both the Plaintiffs (as homeowners) and the Defendants (as lenders).

3. In the event of a loss, the mortgages state that any proceeds from insurance claims shall be applied to restoration or repair of the property or, if repair is not economically feasible, applied to the outstanding mortgage in a prescribed manner.

4. The Cophers' home was critically damaged by hail on November 5, 2008. They submitted a claim to their insurance company and received a check for the loss payment in the amount of $20,122.78 (the "Copher Loss Check"), which was made payable to both the Copher Plaintiffs and BAC. When the Cophers went to their local Bank of America retail branch, they were told that they needed to send the Copher Loss Check to BAC to endorse it, which they promptly did. The Cophers followed the instructions that they were given by Defendants on how receive the funds to repair their roof. They repeatedly confirmed to Defendants that they did not want the amounts applied to their outstanding mortgage balance because they would not be able to repair the roof without the funds from the Copher Loss Check. Almost four years later, Defendants have not provided the funds to the Cophers to pay for repairs, and have not credited the funds to their outstanding mortgage balance. Defendants have also not even kept a proper record of these funds in the loan history, essentially keeping the money with no accountability to the Cophers.

5. Similarly, the Richards' home was seriously damaged by hail in July 2011. They submitted a claim to their insurance company and received a check for the loss payment in the amount of $19,965.99 on or about January 25, 2012 (the "Richard Loss

Check"), which was made payable to both the Richards and "BAC Home Loans." The Richards promptly sent the Richard Loss Check to Defendants for endorsement and complied with all of Defendants' follow up paper work requirements. However, ***more than one year later***, the Richards have still not received a single penny to repair their home, nor has the Richard Loss Check been applied to their mortgage. Just like the Cophers, these funds do not appear on the Richards' loan history and Defendants have provided no accounting for this money.

6. Defendants have failed to abide by the requirements of the mortgages by failing to release the property insurance claim funds, preventing either the necessary repairs that the insurance was designed to provide or the application of the funds to the outstanding mortgage balances.

## PARTIES

7. Plaintiff James D. Copher is a citizen of the State of Oklahoma, and is a resident of this District in Norman, Oklahoma (the "Copher Property").

8. Plaintiff Cynthia Copher is a citizen of the State of Oklahoma, and is a resident of this District.

9. Plaintiff James Richard is a citizen of the State of Oklahoma, and is a resident of this District in Yukon, Oklahoma (the "Richard Property").

10. Plaintiff Rosamma Richard is a citizen of the State of Oklahoma, and is a resident of this District. She is the spouse of James Richard.

11. Defendant Bank of America, N.A. (previously defined as "BANA") is the successor by merger, as of July 1, 2011, to Defendant BAC Home Loans Servicing, L.P.

(previously defined as "BAC").  BAC was formerly known as Countrywide Home Loans Servicing, L.P.  BANA is a national banking association headquartered in Charlotte, North Carolina.  BANA regularly conducts business in this District.  The Defendants act or acted as mortgage servicers for the Plaintiffs' mortgages.

## JURISDICTION AND VENUE

12. This Court has original jurisdiction over this class action pursuant to 28 U.S.C. §1332(d)(2).  The claims of the Class members in this class action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, and the total number of members of the proposed Class is believed to be greater than 100.

13. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, Plaintiffs reside in this District, and the Defendants are subject to jurisdiction here and regularly conduct business in this District.

## FACTUAL ALLEGATIONS

**The Copher Plaintiffs**

14. On December 12, 2006, the Cophers took out a mortgage, secured by the Cophers Property, with the principal amount of $270,400 (the "Copher Mortgage," attached as Exhibit 1).  The footer of the Copher Mortgage states that it is an "FNMA/FHLMC UNIFORM INSTRUMENT," which indicates that it conforms to the standards established by the Federal National Mortgage Association ("Fannie Mae").

15. Section Five of the Copher Mortgage requires valid property insurance with a "standard mortgage clause," and requires that the lender be named as a "loss payee."

As a result of this standard clause, any proceeds from an insurance claim would be directed to both the Cophers and the holder of the mortgage.

16.     The same standard section also requires that Defendants must apply the proceeds of a claim to the repair or restoration of the Copher Property or, if that is not reasonable, to reduce the amount owed under the Copher Mortgage:

> Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security interest is not lessened.  During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. . . . If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument . . . .

17.     The Copher Mortgage does not provide a time frame in which the Defendants must release the funds for these purposes.  However, to the extent that Defendants inspect the restorations of the property before releasing additional funds, "such inspection shall be undertaken *promptly*."  (Emphasis added.)  Any reasonable time period would be measured in days and not years.

18.     As one of the largest purchasers of residential mortgages in the country, Fannie Mae issues servicing guides for companies that service mortgages that it owns.  In Chapter 5 of the most-recent guide for single-family homes issued on March 14, 2012 (the "Servicing Guide"), Fannie Mae noted that the servicer is responsible for, among other things, taking prompt action to protect the interests in the property, including working with the borrower to make sure that the repairs are made.  A servicer must also

"consider the effect that any delays in restoring the property or in repairing damages will have on individual borrowers." Section 501.01 of the Servicing Guide warns that in the extreme situation where the property has "suffered *a total or near-total loss*, it may not be possible to complete the reconstruction *within 90 days*," (emphasis added), clearly implying that less drastic repairs should be accomplished more quickly.

19. On November 5, 2008, the Copher Property's roof, screens, and gutters were damaged in a hailstorm. There were water stains in the ceiling of the living room underneath the damaged section of the roof, as well as the ceiling in the laundry room.

20. The Cophers submitted a claim to their insurance company, State Farm Fire and Casualty Company ("State Farm"), who sent an adjustor to inspect the damage in March 2009. The adjuster estimated a net actual cash value for the necessary repairs of $20,123.85.

21. State Farm then issued the Copher Loss Check on August 4, 2009 in the amount of $20,122.78, made out to both of the Cophers and BAC.[1]

22. The Cophers took the check to their local Bank of America branch in Norman, Oklahoma a few days after they received it. An employee informed them that the Copher Loss Check could not be endorsed at that location, and they would have to mail it to another address, which they promptly did.

23. BANA cashed the Copher Loss Check and kept the funds.

---

[1] State Farm originally issued a check to the Cophers and Countrywide Home Loans Servicing LP. The Copher Loan Check replaced this original check because Countrywide was purchased by BAC.

24. Less than a month after submitting the check, the Cophers spoke to a representative of Defendants on the phone. They were informed that, in order to release the funds to repair their home, they would have to submit additional information regarding the contractor who would perform the work. Similarly, the Cophers received a letter dated September 14, 2009 informing them of the information that they needed to provide in order to release the funds to repair their home.

25. The Cophers selected a reliable contractor who they trusted, David Grace, and gathered the relevant forms (including Mr. Grace's W-9 information) and faxed this information to Defendants. The Cophers promptly complied with all of the requirements presented by Defendants in order to release the funds to repair their home.

26. When the Cophers did not receive the funds, they followed up with dozens of phone calls to Defendants. On one occasion, the Cophers were informed that the Defendants would release $10,000 to their contractor in order to begin work on the Copher Property, but that the remainder of the Copher Loss Check would be paid to the contractor after the work was completed to Defendants' satisfaction. Defendants have never made this initial payment or any payment whatsoever to the contractor, despite the Cophers' repeated requests to Defendants to do so.

27. The Cophers made numerous attempts to contact Defendants about these funds and left message after message with the appropriate representatives, but could not resolve the issue.

28. The Cophers eventually fell behind on their mortgage payments. When they discussed their situation with Defendants, they were asked once again whether they

would like to apply the Copher Loss Check to their outstanding balance on the Copher Mortgage. The Cophers confirmed that they wanted to repair the damage to their home.

29. On January 29, 2013, BAC filed a Second Amended Petition seeking to foreclose on the Copher Property (the "Copher Foreclosure"). Among other things, the Copher Foreclosure claims that the Cophers owed $266,513.69 plus interest and other fees. This amount does not reflect any reduction by the Copher Loss Check.

30. The Cophers received a loan history statement prepared on February 22, 2013, which does not show any application of the Copher Loss Check to their outstanding mortgage balance.

31. The Defendants have failed to either apply the Copher Loss Check to the outstanding balance on the Copher Mortgage or provide the funds to repair the Copher Property, as is required by the Copher Mortgage and as they have represented that they would do.

**The Richard Plaintiffs**

32. In March 1999, the Richards entered into a mortgage, secured by the Richard Property, with a principal amount of $165,000 (the "Richard Mortgage," attached as Exhibit 2, collectively with the Copher Mortgage, the "Mortgages"). The footer of the Richard Mortgage states that it is a "FNMA/FHLMC UNIFORM INSTRUMENT," which indicates that it conforms to the standards established by Fannie Mae.

33. Section Five of the Richard Mortgage requires the borrower (*i.e.*, the Richards) to insure the Richard Property against loss through hazard or property

insurance. The "insurance policies and renewals shall be acceptable to Lender[2] and shall include a standard mortgage clause." As a result of this standard clause, any proceeds from an insurance claim would be directed to both the Richards and the holder of the mortgage.

34. The same standard section also requires that Defendants must apply the proceeds of a claim to the repair or restoration of the Richard Property or, if that is not reasonable, to reduce the amount owed under the Richard Mortgage:

> Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

35. The Richard Mortgage does not provide a time frame in which the Defendants must release the funds for these purposes. As noted above, the Richard Mortgage itself establishes that the Richards must respond to a settlement offer within 30 days, showing the importance of speedy resolution.

36. Other similarly-situated mortgage lenders recognize the importance of disbursing insurance proceeds rapidly in order to repair the property. In January 2002,

---

[2] On the same day that the Richards executed the Richard Mortgage, the original lender—Mortgage Capital Lending, Inc.—purportedly assigned the Richard Mortgage to Countrywide Home Loans Inc.

the Richards took out a second mortgage on the Richard Property in the amount of $73,153.63 (the "Second Richard Mortgage"). The Second Richard Mortgage similar requires property insurance with a standard mortgage clause. The lender under this mortgage also can only apply the proceeds of an insurance claim to reduce the indebtedness under the Second Richard Mortgage or repair the Richard Property. However, the Second Richard Mortgage clearly states that "Any proceeds ***which have not been disbursed within 180 days after their receipt*** and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under the Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to principal balance of indebtedness." (Emphasis added.)

37.   In early July 2011, the Richard Property was damaged by baseball-sized hail that struck and critically damaged the roof. The Richards acted promptly and notified their insurance carrier, American Modern Home Insurance, Co. ("American Modern"), about the loss. The claims adjuster for the insurance company determined that the roof was "totaled" and would have to be replaced.

38.   On January 25, 2012, American Modern issued a check for $19,965.99 made payable to BAC Home Loans and the Richards (previously defined as the "Richard Loss Check"). In order to receive the funds and repair their home, the Richards promptly signed the Richard Loss Check and sent it to Defendants to sign. The Richard Loss Check was endorsed by BANA and deposited on February 9, 2012.

39. The Richards spoke to a representative of BANA at the toll-free number provided, who informed them that they would also need to provide proper documentation from a general contractor who would make the necessary repairs, detailing the work to be performed and an estimate of charges. The Richards promptly complied and provided all of the documentation requested by BANA.

40. On July 24, 2012, BANA faxed a letter to the Richards informing them in writing what documentation regarding the repairs to the Richard Property would be required before BANA would distribute the proceeds. The Richards again spoke to a representative of BANA at the provided toll-free number immediately after receiving the fax and explained that the necessary documentation had already been provided. Because BANA had previously commenced a foreclosure proceeding against the Richards, they were now referred to BANA's attorney handling the foreclosure action. Repeated attempts to contact this attorney were unsuccessful since that attorney claimed not to know anything about it.

41. The Richards have been harmed, and continue to be harmed, by the failure to receive the $19,965.99 necessary to repair their home, as established by the insurance adjuster in January 2012, or, in the alternative, to have this amount applied to the outstanding balance of the Richard Mortgage.

42. Furthermore, a recent loan history statement provided to the Richards shows that the Richard Loss Check has not been applied to their mortgage. Nor does the loan history indicate in any manner that these funds are at issue—it shows no record that

almost one third of the total unpaid balance could potentially be applied to the Richard Mortgage.

## CLASS ALLEGATIONS

43. Plaintiffs bring this suit as a class action on behalf of themselves and on behalf of others similarly situated pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2), and/or 23(b)(3) (the "Class"). The proposed Class consists of:

> All borrowers that have or had mortgages serviced by BANA, or its predecessors, on property located within the United States, whose property insurance claim proceeds were not applied to the unpaid total balance of their mortgages or distributed to perform the repair or restoration of the secured property within the applicable statute of limitations through the present ("the Class Period"), excluding i) any individuals who have granted BANA a full release which would bar the claims asserted in this action; and ii) any individuals whose claims asserted in this action, by virtue of a judgment entered in another proceeding, are precluded by such judgment.

44. Plaintiffs also bring this suit as a class action on behalf of the following subclass ("Oklahoma State Subclass"):

> All borrowers that have or had mortgages serviced by BANA, or its predecessors, on property located within the State of Oklahoma, whose property insurance claim proceeds were not applied to the unpaid total balance of their mortgages or distributed to perform the repair or restoration of the secured property within the Class Period, excluding i) any individuals who have granted BANA a full release which would bar the claims asserted in this action; and ii) any individuals whose claims asserted in this action, by virtue of a judgment entered in another proceeding, are precluded by such judgment.

45. Unless otherwise indicated, the Class and the Oklahoma Subclass are referred to herein jointly as the "Class."

46. The members of the Class are so numerous that joinder is impracticable. BANA is one of the largest mortgage servicers in the country, with almost $2 trillion in

mortgages and more than 10 million loans in its portfolio as of December 31, 2012, according to the Form 10-K filed with the Securities and Exchange Commission on February 28, 2013.  There are 37 Bank of America locations in the State of Oklahoma.

47. Plaintiffs' claims are typical of the claims of the entire Class because Defendants failed to distribute or pay the proceeds from their insurance claims, and Defendants have a common course of conduct of failing to distribute or pay proceeds from insurance claims with regard to other Class members.  Furthermore, the mortgages that conform to Fannie Mae's uniform standards have similar requirements that any insurance proceeds be applied either to the repair of the underlying property or to reduce the outstanding balance on the mortgage.

48. Plaintiffs will fairly and adequately represent and protect the interests of the other Class members for purposes of Federal Rule of Civil Procedure 23(a)(4).  Plaintiffs have no interests antagonistic to those of other Class members.  Plaintiffs are committed to the vigorous prosecution of this action and have retained counsel experienced in litigation of this nature to represent them.

49. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual members of the Class, including, but not limited to:

(a) whether Defendants breached the standard residential mortgage agreements by failing to apply the proceeds of insurance claims to outstanding mortgage balances;

(b) whether Defendants failed to adequately record the proceeds from insurance claims on the Class members' account statements such that the funds can be adequately adjudicated in any potential foreclosure proceedings;

(c) whether Plaintiffs and the Class members are entitled to have the proceeds from insurance claims distributed;

(d) whether Defendants' conduct, as set forth herein, damaged members of the Class and if so, the measure of those damages; and

(e) the nature and extent of any other relief that should be provided.

50. Class certification under Federal Rule of Civil Procedure 23(b)(3) is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

51. Class certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because the Defendants have acted on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

52. Class members have suffered and will suffer irreparable harm and damages as a result of Defendants' wrongful conduct.

## COUNT I

### Breach of Contract

53. Plaintiffs repeat the allegations in the above paragraphs as if fully set forth herein.

54. Plaintiffs executed the Mortgages secured by their residences, which are currently serviced by Defendants.

55. Pursuant to the standard language of the Mortgages, Plaintiffs were required to maintain hazard insurance on their property with standard mortgage clauses listing the Defendants as payees. Similarly, Defendants were required to distribute any proceeds from insurance claims to either repair or restore the damages to the properties, or reduce the outstanding balance on the Mortgages.

56. The other members of the Class also entered into similar agreements with similar requirements, and with language that was either identical or substantially similar in all material respects to the language in the Mortgages.

57. Defendants breached the terms of the Mortgage by failing to distribute or pay the proceeds from the insurance claims or to reduce outstanding mortgage balances.

58. As a direct result of Defendants' unlawful conduct, Plaintiffs and the Class have suffered damages.

## COUNT II

### Unjust Enrichment

59. Plaintiffs repeat the allegations in the above paragraphs as if set forth in full herein.

60. Plaintiffs and Class members provided Defendants with the proceeds of insurance claims, as required under the Mortgages, with the reasonable expectation that the Defendants would either provide the funds to repair their properties or reduce the outstanding balance on the Mortgages.

61. Defendants failed to either provide the funds to repair the properties or reduce the outstanding balance on the Mortgages. Defendants also failed to appropriately record these funds on the Plaintiffs' loan records.

62. Defendants have been unjustly enriched by retaining these funds.

63. It would be inequitable for Defendants to retain the profits and benefits it received from Plaintiffs and the other members of the Class.

## COUNT III

### Conversion

64. Plaintiffs repeat the allegations in the above paragraphs as if set forth in full herein.

65. Defendants have improperly assumed use and control over Plaintiffs' and the Class' proceeds from their insurance claims without applying these funds to their outstanding mortgage balances or making the funds available to repair the Plaintiffs' properties.

66. Defendants have failed to respond to Plaintiffs' efforts to release these funds, and have failed to adequately include these funds in the Plaintiffs' and Class members' loan histories.

67. Defendants' ongoing intentional refusal to honor these requests, and/or conduct in converting such funds to their own accounts, is inconsistent with Defendants' obligations to Plaintiffs and the Class and plainly interferes with Plaintiffs' and each Class member's dominion over his or her property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all members of the Class, pray for relief as follows:

A.  Determining that this action may proceed as a class action under Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, appointing Plaintiffs' counsel as counsel for the Class, and directing that proper notice be distributed to the Class;

B.  Awarding damages sustained by Plaintiffs and the Class as a result of Defendants' breach of contract, together with prejudgment interest;

C.  imposing a constructive trust in favor of Plaintiffs and the Class upon Defendants' unjust enrichment from their unreasonable delay;

D.  Enjoining Defendants from future violations;

E.  Awarding reasonable attorneys' fees and costs, including experts' fees; and

F.  Granting such other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

| | |
|---|---|
| DATED:  April 11, 2013 | /s/ William B. Federman<br>**FEDERMAN & SHERWOOD**<br>William B. Federman (Bar No. 2853)<br>10205 North Pennsylvania<br>Oklahoma City, Oklahoma 73120<br>Telephone: (405) 235-1560<br>Facsimile:  (405) 239-2112<br>wbf@federmanlaw.com<br><br>**WOLF POPPER LLP**<br>Patricia I. Avery (pro hac vice to be filed)<br>Matthew Insley-Pruitt (pro hac vice to be filed)<br>845 Third Avenue<br>New York, NY 10022<br>Telephone:  (212) 451-9619<br>Facsimile:  (212) 486-2093<br>pavery@wolfpopper.com<br>minsley-pruitt@wolfpopper.com<br><br>*Attorneys for Plaintiff* |